964 F.2d 1501
 UNITED STATES of America, Plaintiff-Appellee Cross-Appellant,
v.
James Edwin SHERROD, Defendant-Appellant Cross-Appellee,
and
Steven Lee Sherrod, a/k/a William Wayne Embry and Lonnie
Jerrell Cooper, Defendants-Appellants,
Jerry Wayne Sewell, II and Jerry Wayne Sewell, Sr.,
Defendants-Appellants Cross-Appellees.
 No. 90-4467.
 United States Court of Appeals,
Fifth Circuit.
 June 23, 1992.
 
 Gaylyn Cooper, Beaumont, Tex. (Court-appointed), for James Edwin Sherrod.
 Steven C. Barkley, Beaumont, Tex. (Court-appointed), for Steven Lee Sherrod.
 Linda Cansler, Beaumont, Tex. (Court-appointed), for Jerry Lee Sewell, II.
 Kent Adams, Beaumont, Tex. (Court-appointed), for Jerry Lee Sewell, Sr.
 Dewey J. Gonsoulin, Beaumont, Tex. (Court-appointed), for Lonnie J. Cooper.
 Bob Wortham, U.S. Atty., James O. Jenkins, Paul E. Naman, Asst. U.S. Attys., Beaumont, Tex., Mervyn Hamburg, Dept. of Justice, Washington, D.C., for U.S.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before GARWOOD and DEMOSS, Circuit Judges, and LITTLE,* District Judge.
 GARWOOD, Circuit Judge:
 
 
 1
 A jury convicted the five defendants-appellants now before this Court of three counts involving, inter alia, conspiracy to manufacture and the manufacture of phenylacetone and methamphetamine. We affirm the convictions and sentences of all five defendants.
 
 Proceedings Below
 
 2
 Defendants Jerry Wayne Sewell, Sr. (Sewell, Sr.), Jerry Wayne Sewell II (Sewell II), Lonnie Jarrell Cooper (Cooper), James Sherrod, and Steven Sherrod were charged in a May 1989 superseding indictment.[1] Also charged in this indictment were co-defendants Jack Rhodes (Rhodes), Dan Hill (Hill), Lisa Ervin (Ervin), and Darlene Roznovsky (Roznovsky).[2] The indictment contained three counts: (1) conspiracy to (a) manufacture phenylacetone (P2P), amphetamine, and methamphetamine, (b) possess amphetamine and methamphetamine with the intent to distribute, and (c) distribute amphetamine and methamphetamine; (2) manufacturing P2P; and (3) manufacturing a mixture containing methamphetamine. The conspiracy charge and the charge of manufacturing the methamphetamine mixture alleged enhanced penalty provisions for violations of 21 U.S.C. §§ 846 and 841(a)(1) involving a kilogram or more of a mixture or substance containing a detectable amount of methamphetamine.
 
 
 3
 Following a jury trial in October and November 1989, defendants were convicted and sentenced on all three counts. They appeal their convictions and sentences on constitutional and evidentiary grounds. The Government cross-appeals the sentences of James Sherrod, Sewell, Sr., and Sewell II, alleging noncompliance with the sentencing guidelines and statutory minimum sentence provisions.
 
 Factual Background
 
 4
 In early 1989, law enforcement officials from the Sheriff's Department of Calcasieu Parish, Louisiana, began working with a confidential informant, Danny Johnson (Johnson),[3] to identify and apprehend individuals involved in drug trafficking in the area. Among the names given to the authorities by Johnson was that of defendant Sewell, Sr.,[4] from whom Johnson had previously obtained methamphetamine. One of the primary goals of Johnson's cooperation with the Calcasieu Parish Sheriff's Department was to locate the laboratory source of Sewell, Sr.'s methamphetamine.
 
 
 5
 When Johnson first began work as an informant, the law enforcement officials' focus was on Sewell, Sr.'s connections with a source of methamphetamine in San Antonio, Texas, known as "Fred." Because of financial problems with Fred, however, Sewell, Sr. began making arrangements to manufacture amphetamine and methamphetamine independently.
 
 
 6
 Preparations were begun for making the drugs: several conversations concerning the conspiracy were held in Cooper's auto mechanic shop in Mossville, Louisiana; Rhodes, an associate of Sewell, Sr. from Oklahoma, located a chemist, or "cook";[5] Cooper compiled a list of the chemicals and equipment necessary for the laboratory process; Sewell II and Roznovsky collected equipment and chemicals stored on Sewell, Sr.'s property; Sewell II, Steven Sherrod, and Rhodes helped load the items into Rhodes' car, a 1977 Cadillac, for transport to the laboratory site, which was in a semi-rural area near Orange, Texas.
 
 
 7
 On March 8, 1989, Johnson, Rhodes, Steven Sherrod, and James Sherrod drove to Dallas in the Cadillac. In Dallas, they met Roznovsky who had gone there to purchase the remaining chemicals and laboratory equipment. These items were placed in the trunk of the Cadillac, along with the equipment and chemicals that had come from Sewell, Sr. The four men then continued on to Lake Charles, Louisiana, where Johnson had an apartment.
 
 
 8
 Law enforcement officials, in close contact with Johnson, kept the Cadillac under surveillance and contacted the Texas Department of Public Safety (DPS) to arrange a stop of the vehicle in order to obtain the identity of its occupants.[6] A DPS patrolman stopped the car near Beaumont on the pretext that a tail light was malfunctioning. He ascertained that the occupants were Johnson, Rhodes, and James Sherrod; Steven Sherrod produced false identification giving his name as William Wayne Embry. The DPS officer, as requested by Louisiana law enforcement officers, did not search the car.
 
 
 9
 Once the four men arrived in Lake Charles, Johnson contacted Cooper to get directions to the laboratory. Cooper arranged to lead them to the laboratory the next morning. The next day, the group met Cooper at a local truck stop and followed him to an auto mechanic shop near Orange, Texas, owned by Hill. The group unloaded the items from the trunk and carried them to the laboratory, which was set up in an old school bus located behind Hill's trailer. The group discovered that one of the laboratory flasks was the wrong size. Sewell, Sr., who had remained in Bells, Texas, sent Roznovsky to Orange with the proper equipment.
 
 
 10
 James Sherrod began working in the laboratory on March 9. Hill was also there working on a batch of methamphetamine that he had started before the others arrived. Steven Sherrod and Rhodes stayed in Johnson's apartment in Lake Charles. Johnson made several trips to the laboratory to check on things, reporting by telephone to Sewell, Sr. and Cooper and keeping the law enforcement officials apprised of the situation.
 
 
 11
 The Calcasieu Parish Sheriff's Department, joined by agents from the Drug Enforcement Agency (DEA) and officers from the Orange County police and sheriff departments, maintained a constant surveillance of the Hill property. Early in the morning of March 11, DEA agents obtained a warrant to search the Hill property. The officers planned to wait to execute the warrant until Sewell, Sr. arrived at the laboratory to inspect the finished product. During the afternoon of March 11, however, officers near the laboratory observed Rhodes and Steven Sherrod arrive in the Cadillac, open the trunk of the vehicle, and drive away a few minutes later. Fearing that the defendants were dismantling the laboratory to move it or that Rhodes and Steven Sherrod were removing evidence, officers stopped the Cadillac after it had crossed the state line into Louisiana. Shortly thereafter, the agents executed the search warrant at the laboratory site.
 
 
 12
 In the school bus, the agents found chemical mixtures in a cake pan, a Coca-Cola syrup canister, and a Mason jar. The agents took samples from each of these containers; tests of these samples revealed methamphetamine.[7] Precursor chemicals were also found in the bus.[8]
 
 
 13
 At the same time they obtained the search warrant, the agents also obtained from the magistrate issuing the warrant an order permitting them to destroy the chemical mixtures (except for retained samples), provided that photographs were taken of the mixtures and their containers before the destruction.[9] The order did not contain any provision allowing for the destruction of the containers themselves. Nevertheless, the agents at the scene decided to destroy the containers as well because they were contaminated by the hazardous chemical mixtures.[10] Samples of the mixtures from at least two of the containers were retained, and later tested.
 
 
 14
 Defendants were arrested and indicted on conspiracy and manufacturing charges.
 
 Discussion
 
 15
 I. Cross Appeal.
 
 
 16
 The Government cross-appeals the sentences of Sewell, Sr. and Sewell II, contending that the district court erred in applying the statutory minimum penalty provisions of 21 U.S.C. § 841(b)(1)(B) instead of those of section 841(b)(1)(A).[11]
 
 
 17
 The version of 21 U.S.C. § 841 that was in effect at the time of the offenses set forth two different penalties for identical violations of section 841(a)[12] involving one hundred grams or more of a mixture or substance containing a detectable amount of methamphetamine.[13] Under section 841(b)(1)(A), the penalty for a first-time offender was a term of imprisonment which could not be less than ten years or more than life; for a defendant with two or more final convictions for a felony drug offense, the penalty was "a mandatory term of life imprisonment without release." Section 841(b)(1)(B) provided a penalty for the same violation of a term of imprisonment which could not be less than five years and not more than forty years; if the defendant had a prior final conviction for a drug-related felony, the sentence was for a term of imprisonment not less than ten years and not more than life.
 
 
 18
 Sewell, Sr. and Sewell II were convicted of manufacturing 17.5 kilograms of a mixture containing a detectable amount of methamphetamine and were sentenced under section 841(b)(1)(B). Sewell II received the statutory minimum sentence of five years' imprisonment on each count, running concurrently. Sewell, Sr. had three prior convictions for drug-related felonies and therefore was subject to the more serious penalty. He received concurrent sentences of 360 months on all counts.
 
 
 19
 The Government contends that the Sewells should have been sentenced under section 841(b)(1)(A). Under this provision, Sewell II would have received a minimum sentence of ten years and Sewell, Sr. would have received a mandatory life sentence.
 
 
 20
 Although we would tend to agree with the Government under the current version of the statute, we are unable to do so under the version in effect at the time of the offense. United States v. Kinder, 946 F.2d 362, 367-68 (5th Cir.1991) (remanding for resentencing under section 841(b)(1)(B) because the district court violated the rule of lenity). Following Kinder, we hold that the district court did not err in sentencing the Sewells under section 841(b)(1)(B).
 
 
 21
 II. Sentences of Lonnie Cooper and James Sherrod.
 
 
 22
 The Government also cross-appeals the sentence of James Sherrod, arguing that the district court should have increased his Guidelines range three levels for supervisor/manager status based upon his role as the chemist. See U.S.S.G. § 3B1.1(b).[14] Cooper raises the opposite claim, contending that the district court erred in finding him to be a supervisor/manager and in raising his Guidelines level by the required three levels. Cooper contends not only that he was not a manager or supervisor but that he was entitled to a reduction of two to four levels because of his minimal or minor role in the group. See U.S.S.G. § 3B1.2.[15]
 
 
 23
 This Court will uphold the district court's Guidelines sentence if it results from a legally correct application of the Guidelines to factual findings that are not clearly erroneous. United States v. Ponce, 917 F.2d 841, 842 (5th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991); United States v. Manthei, 913 F.2d 1130, 1133 (5th Cir.1990); United States v. Suarez, 911 F.2d 1016, 1018 (5th Cir.1990). A finding of fact is not clearly erroneous if it is plausible in light of the record viewed in its entirety. Anderson v. Bessemer City, 470 U.S. 564, 573-76, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985). We review legal conclusions concerning the Guidelines de novo. Manthei, 913 F.2d at 1133.
 
 
 24
 After reviewing the record, we conclude that the factual findings made by the district court in this respect were not clearly erroneous. Although James Sherrod, as the chemist, was undoubtedly a necessary member of the conspiracy, the record supports the district court's finding that he did not manage any part of the conspiracy. Likewise, although Cooper claims that he played a minimal or minor role in the conspiracy, the district court's finding that Cooper coordinated the set up of the laboratory is based on ample evidence in the record, and adequately supports the determination that he was neither a minimal nor a minor participant.[16]
 
 
 25
 Finding no error, we affirm the sentences of James Sherrod and Lonnie Cooper.
 
 
 26
 III. Issues Related to the Finding that the Conspiracy Involved 17.5 Kilograms.
 
 
 27
 The defendants raise three issues related to the district court's finding that the conspiracy involved 17.5 kilograms of the methamphetamine mixture. First, they contend that their rights to due process and confrontation were violated because the mixtures (other than retained samples) and containers were destroyed before anyone made an accurate measurement of the amount of the mixture. Second, they claim that the district court erred in finding that the laboratory contained 17.5 kilograms of the mixture. Finally, they argue that the district court should not have sentenced them on the basis of the entire 17.5 kilograms because the mixture contained only a little pure methamphetamine. We reject each of these contentions.
 
 A. Destruction of physical evidence
 
 28
 Each defendant claims he was denied his constitutional rights to due process and confrontation because the Government destroyed the chemical mixtures (other than retained samples) and containers without accurately measuring the mixtures or allowing the defendants the opportunity to measure them.[17]
 
 
 29
 This issue has been addressed by a prior panel of this Court in an opinion deciding the appeal of co-defendant Jack Rhodes. See United States v. Rhodes, No. 90-4538 (5th Cir. September 27, 1991) [946 F.2d 891 (table) ] (unpublished opinion). It is a general rule in this Circuit that one panel may not overrule the decision of a prior panel in the absence of an intervening contrary or superseding decision by the court en banc or the Supreme Court. See, e.g., Pruitt v. Levi Strauss & Co., 932 F.2d 458, 465 (5th Cir.1991). Thus we are bound to follow the decision in Rhodes on issues previously decided.
 
 
 30
 This Court in Rhodes held that the destruction of the methamphetamine and containers did not deprive co-defendant Rhodes of his rights to due process or confrontation. "The process due a defendant who believes that the sentencing information is incorrect is the opportunity to show that the information is materially untrue." Rhodes, at p. 4 [946 F.2d 891 (table) ] (citing United States v. Rodriguez, 897 F.2d 1324, 1328 (5th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 158, 112 L.Ed.2d 124 (1990)).
 
 
 31
 The defendants were aware long prior to their sentencings that the Government would request sentencing based upon the methamphetamine mixture being in the amount of 17.5 kilograms. The evidence produced by the Government at the trial in October and November 1989 was that the laboratory contained 17.5 kilograms of the methamphetamine mixture. In addition, the presentence reports for each defendant calculated the Guidelines sentencing level using the 17.5 kilogram figure.
 
 
 32
 The defendants were afforded ample opportunity to attempt to show that the Government's evidence was incorrect. James Sherrod and Hill testified about the quantity of drugs at James Sherrod's sentencing hearing, and James Sherrod testified on this issue again at Sewell, Sr.'s sentencing hearing. Counsel for all defendants were present at both hearings and were given an opportunity to question the witnesses. That the district court obviously found the Government's evidence more credible does not prove a due process violation.
 
 
 33
 The defendants also were not deprived of their right to confrontation. This right is substantially limited at a sentencing hearing; the district court may even base its findings on out-of-court statements. Rhodes, at p. 5 [946 F.2d 891 (table) ]; Rodriguez, 897 F.2d at 1328. Although the defendants did not choose to make use of the opportunity, they could have called the DEA chemist, George Lester, to the stand at the sentencings to testify regarding the calculations of the volumes of the canister and the pan.
 
 
 34
 We hold that the destruction of the methamphetamine mixtures (other than the retained samples) and their containers did not deprive the defendants of their constitutional rights.[18]
 
 
 35
 B. Factual findings of the amount of methamphetamine mixture
 
 
 36
 The defendants contend that the district court erred in finding that the amount of the methamphetamine mixture found in the laboratory was 17.5 kilograms.
 
 
 37
 This Court will uphold a district court's findings about the quantity of drugs involved unless they are clearly erroneous. United States v. Ponce, 917 F.2d 841, 842 (5th Cir.1990). A clearly erroneous finding is one that is not plausible in the light of the record viewed in its entirety. Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
 
 
 38
 In determining drug quantities, the district court may consider any evidence which has "sufficient indicia of reliability." U.S.S.G. § 6A1.3, comment; United States v. Manthei, 913 F.2d 1130, 1138 (5th Cir.1990). This evidence may include estimates of the quantity of drugs for sentencing purposes. United States v. Coleman, 947 F.2d 1424, 1428 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992). The district court's factual findings of the amount of drugs involved must be supported by what it could fairly determine to be a preponderance of the evidence. United States v. Thomas, 932 F.2d 1085, 1091 (5th Cir.1991), cert denied, --- U.S. ----, 112 S.Ct. 887, 116 L.Ed.2d 791 (1992).
 
 
 39
 All of the Government records created at the time of the arrest and search of the laboratory were based on the DEA agents' estimates that the amounts of the mixtures in the cake pan, Coke canister, and Mason jar totalled 4.5 kilograms. These estimates were not based on any accurate measurements made at the scene, but were conservative guesses of the amounts of the mixtures. The Government's trial evidence, however, was that the laboratory contained 17.5 kilograms of the methamphetamine mixture. This evidence consisted of the testimony of DEA Special Agent Shoquist and George Lester, a chemist for the DEA.[19] Before the trial began, Shoquist obtained and measured the capacity of a standard Coke canister of the kind that had been destroyed. Also, he reworked his estimate of the volume of the cake pan based on measurements of the pan made at the time of the search. Based upon these calculations of the volumes of the cake pan and canister, Lester testified that the methamphetamine mixture found in the laboratory totalled 17.5 kilograms.
 
 
 40
 Defendants have not overcome their difficult burden of showing that the district court's reliance on the 17.5 kilogram figure was clearly erroneous. Here, the sworn testimony of the two Government agents is a sufficient "indicia of reliability" to support the district court's findings. The district court, after hearing the testimony and viewing all the evidence, found the 17.5 kilogram estimate to be credible. The mere existence of a discrepancy between the original estimate and the evidence introduced at trial does not render the district court's use of the 17.5 kilogram amount clearly erroneous.[20] See United States v. Rhodes, at pp. 3-4 [946 F.2d 891 (table) ].
 
 
 41
 We hold that the district court did not err in sentencing the defendants based upon the calculation that 17.5 kilograms of drugs were involved.
 
 C. Purity of the methamphetamine mixture
 
 42
 The defendants contend that use of the 17.5 kilogram figure for sentencing constitutes error because the mixture was not pure methamphetamine, and that the district court should have considered only the amount of methamphetamine that could have been produced.
 
 
 43
 This Circuit has held that consideration of the total weight of a substance containing a detectable amount of methamphetamine is proper in determining the defendant's sentence. See United States v. Walker, 960 F.2d 409, 412 (5th Cir.1992); United States v. Mueller, 902 F.2d 336, 345 (5th Cir.1990); United States v. Butler, 895 F.2d 1016, 1018 (5th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 82, 112 L.Ed.2d 54 (1990); United States v. Baker, 883 F.2d 13, 15 (5th Cir.), cert. denied, 493 U.S. 983, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989).
 
 
 44
 The defendants argue, however, that a recent Supreme Court decision has in effect overruled these cases. See Chapman v. United States, --- U.S. ----, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). In Chapman, the Court held that the weight of blotter paper on which LSD was customarily distributed was a " 'mixture or substance containing a detectable amount' of LSD," and so was properly considered in determining the proper sentence under the guidelines. Id. 111 S.Ct. at 1925. The Court made clear that Congress intended the carrier medium to be included in the entire weight of the mixture to determine the proper sentence. Id. at 1924. In making this analysis, the Court noted that "Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." Id. at 1925.
 
 
 45
 Both the Sixth and Tenth Circuits have addressed this issue in the context of methamphetamine since Chapman. See United States v. Jennings, 945 F.2d 129 (6th Cir.1991); United States v. Fowner, 947 F.2d 954 (10th Cir.1991) (unpublished opinion), cert. denied, --- U.S. ----, 112 S.Ct. 1998, 118 L.Ed.2d 594 (1992). In Jennings, the Sixth Circuit refused to sentence the defendants on the basis of the total weight of a mixture that contained a small amount of methamphetamine and a large percentage of poisonous by-products. 945 F.2d at 136. The court pointed out that methamphetamine is not mixed with other chemicals in order to dilute the methamphetamine and increase the amount of saleable mixture; instead, the defendants "were attempting to distill methamphetamine from the otherwise uningestable byproducts of its manufacture." Id. at 137. The court concluded that the district court on remand was limited to sentencing the defendants for the amount of methamphetamine they were capable of producing.
 
 
 46
 In our recent Walker decision, we expressly declined to follow the Jennings approach.
 
 
 47
 The interpretation urged by the defendants and adopted by the Sixth Circuit appears to be inconsistent with the statute, the Sentencing Guidelines, and important passages in Chapman.
 
 
 48
 We note that both the statute and the Sentencing Guidelines distinguish between "pure" methamphetamine and mixtures containing methamphetamine. 21 U.S.C. §§ 841(b)(1)(A)(viii) and 841(b)(1)(B)(viii) each expressly set the same penalties based on possession of a much smaller quantity of methamphetamine or possession of a much larger quantity of a "mixture or substance containing a detectable amount of methamphetamine." Similarly, the footnote to the Drug Quantity Table following section 2D1.1 provides that
 
 
 49
 "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.... In the case of a mixture or substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance or the offense level determined by the weight of the pure PCP or methamphetamine, whichever is greater." U.S.S.G. § 2D1.1, Drug Quantity Table (November 1990).
 
 
 50
 The Drug Table distinguishes between methamphetamine and "pure" methamphetamine.[21]
 
 
 51
 The Chapman Court itself noted the statute's and the Sentencing Guidelines' disparate treatment of methamphetamine vis-a-vis other types of drugs:
 
 
 52
 "With respect to various drugs, including heroin, cocaine, and LSD, it provides for mandatory minimum sentences for crimes involving certain weights of a 'mixture or substance containing a detectable amount' of the drugs. With respect to other drugs, however, namely PCP or methamphetamine, it provides for a mandatory minimum sentence based either on the weight of a mixture or substance containing a detectable amount of the drug, or on lower weights of pure PCP or methamphetamine.... Thus, with respect to these two drugs, Congress clearly distinguished between the pure drug and a 'mixture or substance containing a detectable amount of' the pure drug. But with respect to drugs such as LSD, which petitioners distributed, Congress declared that sentences should be based exclusively on the weight of the 'mixture or substance.' Congress knew how to indicate that the weight of the pure drug was to be used to determine the sentence, and did not make that distinction with respect to LSD." Chapman, 111 S.Ct. at 1924 (emphasis in original).
 
 
 53
 After distinguishing between the statutory treatment of LSD and methamphetamine, the Court went on to consider whether Congress intended that the weight of LSD carriers be included for sentencing purposes. It is in this context, after expressly distinguishing the treatment of methamphetamine and PCP, that the Court established its market-oriented analysis. Thus it does not appear that the Chapman Court intended its market-oriented analysis to be applied to methamphetamine or PCP, and indeed Jennings is the only case that has applied the market-oriented analysis of Chapman to methamphetamine.
 
 
 54
 In an unpublished opinion, the Tenth Circuit affirmed a sentence that was based on twenty-four gallons of a liquid mixture that contained detectable amounts of methamphetamine, but that the defendant claimed was waste. Fowner, 947 F.2d 954 (Table case). The court concluded, without citing Chapman or Jennings, that so long as the mixture contained a detectable amount of methamphetamine, the entire weight of the mixture should be included in calculating the base offense level.[22]
 
 
 55
 We are not faced with a situation where a defendant discards some independently acquired methamphetamine by throwing it into his fishpond or stock tank. Instead, the defendants here were convicted of manufacturing methamphetamine (and phenylacetone or P2P), and conspiracy to do so, and the samples tested by the Government of the mixtures found in the laboratory were in the formative stages of the manufacturing process. These circumstances provide strong support for consideration of the weight of the entire mixture for sentencing purposes.
 
 
 56
 Following Walker, we hold that the district court did not err in sentencing the defendants on the basis of the entire 17.5 kilograms of the methamphetamine mixture.
 
 
 57
 IV. Delegation Issue.
 
 
 58
 Two of the defendants contend that the DEA lacked authority to designate P2P as a Schedule II substance.[23] We find no merit in this argument.
 
 
 59
 These defendants assert that the DEA Administrator's order designating P2P as a Schedule II substance is void because the authority to make such a designation is the non-delegable responsibility of the Attorney General. This argument is precluded by the statute itself: 21 U.S.C. § 871 establishes the propriety of the delegation at issue. Subsection (a) of section 871 provides that the Attorney General "may delegate any of his functions under this subchapter to any officer or employee of the Department of Justice."[24] Section 871 has been in effect without amendment since the original enactment of the Drug Abuse Prevention and Control Act in 1970 and was thus in effect when the DEA Administrator placed P2P on the Schedule II list of controlled substances.
 
 
 60
 The defendants ignore section 871 and instead rely on United States v. Spain, 825 F.2d 1426 (10th Cir.1987), to support their contention. In Spain, the Tenth Circuit reversed a conviction for possession of a substance which had been placed on Schedule I by the DEA pursuant to 21 U.S.C. § 811(h), a provision added by the 1984 amendments. The court held that the 1973 delegation[25] to the DEA of the Attorney General's functions under the Drug Abuse Prevention and Control Act of 1970, although previously upheld for section 811(a), did not extend to section 811(h) because of the substantive and procedural differences between section 811(h) and section 811(a). Spain, 825 F.2d at 1429.
 
 
 61
 The designation provision in question here is section 811(e), which grants the Attorney General the authority to add immediate precursors of controlled substances to the list of those already regulated. Although there are no cases deciding the validity of delegation to the DEA under this provision, the Eleventh Circuit upheld the original delegation of authority to the Attorney General in United States v. Hope, 714 F.2d 1084 (11th Cir.1983). The court found the discretion created by section 811(e) to be indistinguishable from that created by section 811(a). Hope, 714 F.2d at 1087. Even the Spain court has upheld the delegation to the DEA of section 811(a) authority. Spain, 825 F.2d at 1427.
 
 
 62
 In addition, a recent Supreme Court decision disapproves of Spain and holds that delegation to the DEA of authority under section 811(h) is valid. Touby v. United States, --- U.S. ----, 111 S.Ct. 1752, 1758, 114 L.Ed.2d 219 (1991).
 
 
 63
 In light of 21 U.S.C. § 871 and the decision of the Supreme Court in Touby, defendants' reliance on Spain is misplaced. Their argument that the DEA lacked authority to designate P2P as a Schedule II substance fails.
 
 
 64
 V. Rynal Issue.
 
 
 65
 The defendants argue that their convictions for manufacturing methamphetamine violate the due process and equal protection clauses because the manufacturer of Rynal, an over-the-counter product containing methamphetamine, is not subject to the same penalties.[26]
 
 
 66
 21 U.S.C. § 811(g)(1) allows the Attorney General to exclude by regulation "any non-narcotic substance from a schedule if such substance may, under the Federal Food, Drug, and Cosmetic Act, be lawfully sold over the counter without a prescription." At the time of the defendants' activity, the Attorney General had exempted Rynal from the list of Schedule II substances pursuant to this provision. 21 C.F.R. § 1308.22 (1989 Edition).[27]
 
 
 67
 Defendants claim that their due process rights have been violated because the statutes create an ambiguity by subjecting them to prosecution while exempting the manufacturer of Rynal. Two unpublished opinions of the Ninth Circuit have rejected this argument in similar contexts. See United States v. Farmer, 956 F.2d 1168 (9th Cir.1992) (holding that 21 U.S.C. § 811 and 21 C.F.R. § 1308.22 provide fair notice); and United States v. Worstell, 951 F.2d 365 (9th Cir.1991) (rejecting the contention that the regulatory scheme is so ambiguous that it fails to give sufficient notice that certain activity is deemed criminal). Furthermore, the defendants have made no showing that their product is eligible for the exemption or that they attempted to make use of the procedure for obtaining an exemption for their product and were denied.
 
 
 68
 Defendants contend that their conviction for manufacturing methamphetamine violates the equal protection clause because the manufacturer of Rynal is not similarly prosecuted. Because defendants' situation does not implicate either a suspect classification or the exercise of a fundamental right, the different treatment of defendants and the manufacturer of Rynal is subject only to rational basis analysis. Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 2394-2395, 72 L.Ed.2d 786 (1982). The medicinal benefit of Rynal, together with its reduced potential for abuse, satisfy this review. See United States v. Worstell.[28]
 
 
 69
 We conclude that the defendants' convictions for manufacturing methamphetamine do not violate the due process and equal protection clauses.
 
 
 70
 VI. Conspiracy Count Issue.
 
 
 71
 Sewell II claims that the conspiracy count was defective because it alleged multiple criminal objectives and that the district court erred in refusing to dismiss it on that ground.
 
 
 72
 The defendants were charged with one count of conspiracy in violation of 21 U.S.C. § 846. The indictment alleged seven objectives of the conspiracy: (1-3) to manufacture P2P, amphetamine and methamphetamine; (4-5) to possess amphetamine and methamphetamine with the intent to distribute; and (6-7) to distribute amphetamine and methamphetamine. Each of the objectives of the conspiracy is prohibited by 21 U.S.C. § 841.
 
 
 73
 In Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942), the Supreme Court held that when there is a single agreement to violate several substantive statutes, the conspirators may not be prosecuted for more than one violation of the general conspiracy statute. This Court has held that a single conspiracy to import heroin could not violate both the general conspiracy statute, 18 U.S.C. § 371, and the statute that specifically prohibits conspiracies to import controlled substances, 21 U.S.C. § 963. United States v. Mori, 444 F.2d 240, 245 (5th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187 (1971). Neither holding applies to these facts.
 
 
 74
 Although count one of the indictment here alleges seven objectives of the conspiracy, the only conspiracy statute charged is section 846. In addition, the only substantive statute implicated is section 841. It is well established that a single conspiracy may have several objectives. United States v. Elam, 678 F.2d 1234, 1250 (5th Cir.1982). See also Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561 (1919) (conspiracy is a single crime, no matter how diverse its objects). A single charge may allege violations of more than one drug conspiracy statute. See United States v. Rodriguez, 585 F.2d 1234 (5th Cir.1978), en banc, 612 F.2d 906 (5th Cir.1980) (finding that Congress intended to permit the imposition of consecutive sentences for violations of 21 U.S.C. § 963 [conspiracy to import a controlled substance] and 21 U.S.C. § 846 [conspiracy to possess with intent to distribute], even though such violations arise from a single conspiracy having multiple objectives)[29], aff'd sub nom. Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).
 
 
 75
 The defendants here were convicted under a single conspiracy statute involving objectives prohibited by a single substantive statute, and were given cumulative sentences for the conspiracy and the substantive offenses. We hold that the indictment was not defective and that the district court did not err in refusing to dismiss it.
 
 
 76
 VII. Severance Issue.
 
 
 77
 Sewell II and James Sherrod claim that the district court erred in refusing to sever their trials and in allowing the Government to introduce evidence of extrinsic acts committed by their co-defendants.
 
 
 78
 The burden to show the need for severance is on the defendant, who must establish that he suffered compelling prejudice that the court could not prevent. United States v. Loalza-Vasquez, 735 F.2d 153, 159 (5th Cir.1984). Severance is not required where only one conspiracy exists, even if the nature of the proof in each case differs, so long as the court below gives sufficient cautionary instructions. United States v. Rocha, 916 F.2d 219, 228 (5th Cir.1990), cert. denied sub nom. Hinojosa v. United States, --- U.S. ----, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991); United States v. Lamp, 779 F.2d 1088, 1093-94 (5th Cir.), cert. denied, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986). The defendants here were all charged in the same conspiracy. The district court cautioned the jury numerous times to consider the evidence as to each defendant separately.
 
 
 79
 Generally, the district court may adequately minimize prejudice to a co-defendant from extrinsic act evidence by giving limiting instructions. See United States v. Parziale, 947 F.2d 123, 129 (5th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1499, 117 L.Ed.2d 638 (1992); United States v. Posner, 865 F.2d 654, 658 n. 1 (5th Cir.1989); United States v. Prati, 861 F.2d 82, 86-87 (5th Cir.1988). Such instructions were given in this case.
 
 
 80
 Finally, prejudice from either the extrinsic act evidence or the failure to grant a severance was limited by the form of the jury verdict submitted by the district court that strongly reinforced the requirement that the jury consider each count and each defendant separately.[30]
 
 
 81
 We find no error on the part of the district court in refusing to allow a severance or in admitting extrinsic act evidence.
 
 Conclusion
 
 82
 The convictions and sentences of all appellants are
 
 
 83
 AFFIRMED.
 
 
 
 *
 District Judge of the Western District of Louisiana, sitting by designation
 
 
 [1]
 The original indictment, filed in March 1989, charged these defendants with two counts, neither of which contained an enhanced penalty provision: (1) conspiracy to manufacture P2P, amphetamine, and methamphetamine; and (2) manufacturing P2P
 
 
 [2]
 These four co-defendants entered into plea arrangements with the Government. Each testified at trial for the Government, except Hill, who testified for the defense. None of these four are parties to the present appeal
 
 
 [3]
 Johnson had agreed to act as a government informant in return for special treatment respecting drug charges pending against him
 
 
 [4]
 Johnson also named Ervin, Roznovsky, and Cooper as associates of Sewell, Sr. who were involved in drug dealing
 
 
 [5]
 Defendant Steven Sherrod introduced his uncle, defendant James Sherrod, to Rhodes at the beginning of March, 1989. James Sherrod was a chemist in the Dallas area
 
 
 [6]
 Johnson had identified James Sherrod and Steven Sherrod to the authorities only as the "cook" and the "bodyguard," respectively
 
 
 [7]
 The methamphetamine mixtures found were in the process of formation
 
 
 [8]
 The DEA agents found 4,750 grams of P2P, a precursor chemical necessary for the manufacture of amphetamine and methamphetamine
 
 
 [9]
 Agents participating in the search took still photographs and made a video of the laboratory scene
 
 
 [10]
 Destruction of the containers was proper according to DEA policy and Environmental Protection Agency guidelines
 
 
 [11]
 Only the sentences of the Sewells will be considered in the determination of this issue; the sentences of the other defendants fall within the scope of either subsection
 We note that although many other sections of the 1988 Anti-Drug Abuse Amendments Act did not become effective until March 18, 1989 (120 days after enactment on November 18, 1988), Subtitle N of P.L. 100-690, which added sections 841(b)(1)(A)(viii) and 841(b)(1)(B)(viii), does not contain a provision for delayed effectiveness. A statute that does not provide otherwise becomes effective upon enactment. United States v. Robles-Pantoja, 887 F.2d 1250, 1257 (5th Cir.1989). Because there is no provision to the contrary, the amendments under which the defendants were sentenced became effective in November 1988, prior to the conduct for which the defendants were convicted.
 
 
 [12]
 21 U.S.C. § 841(a)(1) makes unlawful the knowing or intentional manufacture of a controlled substance
 
 
 [13]
 This overlap of penalties was due to a technical error in the 1988 Anti-Drug Abuse Amendments Act, which was corrected by amendment in 1990. Section 841(b)(1)(A) now applies to violations involving one kilogram or more of a substance containing a detectable amount of methamphetamine
 
 
 [14]
 In determining whether a defendant played a supervisor/manager role in an offense, a court should consider such factors as the exercise of decision-making authority, the degree of participation in planning or organizing the offense, and the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, Application Note 3
 
 
 [15]
 Application Note 1 to section 3B1.2(a) defines a minimal participant as one who is "plainly among the least culpable of those involved in the conduct of a group," as indicated by "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others."
 A minor participant is one who is "less culpable than most other participants, but whose role could not be described as minimal." Section 3B1.2, Application Note 3.
 
 
 [16]
 For example, there is evidence that Cooper compiled a list of chemicals and equipment needed at the laboratory, that Cooper called Hill several days before the activity at the laboratory to inform Hill that some people were coming to use the lab, and that Sewell, Sr. instructed Johnson and Roznovsky to keep Cooper informed of the status of the activity at the lab
 
 
 [17]
 We note that proof of the quantity of drugs involved does not go to guilt or innocence of the section 846 and section 841(a) violations charged, but rather only to the sentence. See Barnes v. United States, 586 F.2d 1052, 1056 (5th Cir.1978). Here, the indictment alleged that the quantity involved was more than one kilogram of a mixture containing methamphetamine. Cf. United States v. Alvarez, 735 F.2d 461, 468 (11th Cir.1984). There was no real dispute that the mixture involved did contain methamphetamine (the retained samples and the test results were made available to defendants) and that the quantity of the mixture was more than one kilogram; the dispute was whether it was only four or five kilograms or more than seventeen
 
 
 [18]
 For due process considerations, see California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 2529, 81 L.Ed.2d 413 (1984) (defendant's due process rights violated only if the evidence destroyed (1) possessed an exculpatory value that was apparent before it was destroyed and (2) was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means); United States v. Binker, 795 F.2d 1218, 1230 (5th Cir.1986) (applying Trombetta in the context of destruction of marijuana), cert. denied, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987); United States v. Webster, 750 F.2d 307 (5th Cir.1984) (same), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985)
 On the issue of the right to confrontation, see United States v. Herndon, 536 F.2d 1027, 1029 (5th Cir.1976) (destruction of a sample of "moonshine" liquor did not deprive a defendant of his Sixth Amendment right to confront witnesses as the Confrontation Clause is restricted to "witnesses" and does not include physical evidence; production of the sample or laboratory notes was not necessary to fully "confront" the government's expert); United States v. Gordon, 580 F.2d 827, 837 (5th Cir.) (following Herndon ), cert. denied, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978).
 
 
 [19]
 Both Shoquist and Lester were present at the time of the search of the laboratory; Lester made the early estimates of 4.5 kilograms
 
 
 [20]
 We note in passing that, although the defendants rely vociferously on the apparent discrepancy between the original estimate of 4.5 kilograms and the final calculation of 17.5 kilograms, the effect of the Drug Equivalency Table of the Sentencing Guidelines (as in effect when the offenses were committed; those in effect at sentencing provided a higher base offense level for the same quantity) weakens this reliance
 Because both P2P and methamphetamine were found in the laboratory, the defendants' sentences were calculated by use of the Drug Equivalency Table. The P2P and the methamphetamine were converted into "equivalent" amounts of cocaine, and the total amount of cocaine was used to determine the offense level. If the 4.5 kilogram figure were used, with the 4,750 grams of P2P, the resulting equivalent of 12.95 kilograms of cocaine would establish an offense level of 32. Using the 17.5 kilogram amount of methamphetamine, again with the 4,750 grams of P2P, the total amount of cocaine is 38.95 kilograms, resulting in an offense level of 34.
 The breaking point between levels 32 and 34 is between 14.9 and 15.0 kilograms of cocaine. The 4.5 kilogram figure, which the evidence revealed was clearly a conservative estimate, when converted with the P2P, produces a total amount of cocaine that is only two kilograms (of cocaine) away from the breaking point. Thus, although the defendants point out repeatedly that the 17.5 kilograms is almost four times greater than 4.5 kilograms, the same sentencing increase would have resulted if the Government's final calculations had been of 5.5 kilograms of the methamphetamine mixture, merely one kilogram (of methamphetamine mixture) more than the original "conservative" estimate.
 
 
 [21]
 The Sentencing Guidelines promulgated in November 1991, although not applicable in this case, have changed the language in the Drug Quantity Table. Instead of referring to Methamphetamine and "Pure Methamphetamine," the Sentencing Guidelines now use the language Methamphetamine and Methamphetamine (actual). This change was probably intended to forestall challenges raised by defendants that their methamphetamine was not "pure" because it was not one hundred percent methamphetamine
 
 
 [22]
 The result reached in Fowner is also more consistent with other circuit decisions involving mixtures of cocaine. See United States v. Restrepo-Contreras, 942 F.2d 96 (1st Cir.1991) (finding that entire weight of cocaine and beeswax statute was to be included for sentencing), cert. denied, --- U.S. ----, 112 S.Ct. 955, 117 L.Ed.2d 123 (1992); United States v. Mahecha-Onofre, 936 F.2d 623 (1st Cir.) (holding that entire weight of suitcases composed of cocaine bonded chemically with acrylic suitcase material was includable for sentencing purposes), cert. denied, --- U.S. ----, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991); United States v. Hood, 956 F.2d 279 (10th Cir.1992) (unpublished disposition) (holding that liquid waste surrounding cocaine base was properly included in determining weight of drug for sentencing purposes). But see United States v. Elmer Acosta, 963 F.2d 551 (2d Cir.1992) (concluding that weight of creme liqueur in which cocaine was dissolved was improperly included in calculating offense level because liqueur was not ingestible); United States v. Rolande-Gabriel, 938 F.2d 1231 (11th Cir.1991) (holding that the term "mixture" in U.S.S.G. § 2D1.1 does not include unusable mixtures of cocaine and liquid waste)
 
 
 [23]
 Sewell II and James Sherrod raise this issue
 
 
 [24]
 Sections 811 and 871 are both part of Subchapter I of Chapter 13 of Title 21. The Administrator of the DEA is an "officer or employee" of the Department of Justice
 
 
 [25]
 See 28 C.F.R. § 0.100
 
 
 [26]
 There is no authority to support defendants' position. The defendants cite two cases that held that the removal of Rynal from the schedules of controlled substances did not operate to remove methamphetamine itself. See United States v. Roark, 924 F.2d 1426 (8th Cir.1991); United States v. Housley, 751 F.Supp. 1446 (D.Nev.1990), aff'd, 955 F.2d 622 (9th Cir.1992). Defendants seek to distinguish their claims on the basis that this case concerns substances containing a detectable amount of methamphetamine rather than "pure" methamphetamine. This distinction is irrelevant in the context of the constitutional claims raised by the defendants
 
 
 [27]
 Rynal has since been removed from the list of exempted substances. See 21 C.F.R. § 1308.22 (1991)
 
 
 [28]
 Defendants also contend that the order exempting Rynal, 21 C.F.R. § 1308.22 (1989 Ed.), is properly read as exempting all substances containing d1-methamphetamine hydrochloride because the section 811(g)(1) exclusion authority is limited to substance, not products. We do not so read the order, which is plainly limited to the product Rynal, a spray manufactured by Blaine Co. Nothing even remotely similar to Rynal is involved here. The defendants may not use this criminal proceeding to collaterally expand the plainly limited exclusion
 
 
 [29]
 Rodriguez was overruled by United States v. Michelena-Orovio, 719 F.2d 738, 756-757 (5th Cir.1983), cert. denied, 465 U.S. 1104, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984), to the extent that it held that a defendant's guilt of conspiracy to possess with intent to distribute a controlled substance could not be inferred from the quantity of the substance that the defendant had conspired to import. Michelena-Orovio did not change the rule that a defendant may be convicted of violating both drug conspiracy statutes in connection with a single conspiracy
 
 
 [30]
 The verdict form had a separate guilty or not guilty answer blank for each defendant as to each of the two substantive counts. As to the conspiracy count, there was first an answer blank as to whether the conspiracy charged was proved beyond a reasonable doubt to have existed; then (conditional on an affirmative answer to that question) separate answer blanks as to each defendant as to whether he was found beyond a reasonable doubt to be a member of the conspiracy, and (if so) then, as to each defendant, which of the seven alleged objectives he intended. All blanks were answered adversely to each of the appellants