# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-10676

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ANGELA REYNOLDS,

Defendant - Appellant

United States Court of Appeals
Fif h Circuit

**FILED**
August 3, 2017

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, GRAVES, and COSTA, Circuit Judges.

PER CURIAM:*

Angela Reynolds appeals her 275-month sentence for conspiring to deal methamphetamine. She contests the district court's drug quantity determination and also challenges the application of the career offender enhancement under Section 4B1.1 of the Sentencing Guidelines. The evidence supports the former and the latter did not affect her sentence. We AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-10676

**I.**

Reynolds received and distributed methamphetamine in the Dallas-Fort Worth Area. Agents identified Reynolds as a suspect and obtained a warrant to search her home. Inside, the agents found two bags of meth. After cooperating with agents and assisting in the arrest of other members of the conspiracy, Reynolds was charged along with ten others. She pleaded guilty to a conspiracy charge.

The quantity of drugs involved in the offense is typically the prime driver of the Guidelines range. *See* U.S.S.G. § 2D1.1 (2015). For most drugs, "the weight of a controlled substance refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." U.S.S.G 2D1.1(c); *United States v. Koss*, 812 F.3d 460, 467 (5th Cir. 2016). For methamphetamine, however, the actual amount of meth in a mixture (that is, pure meth) is the controlling factor.[1] U.S.S.G. § 2D1.1(c), (Notes to Drug Quantity Table (B)). Two common forms of pure meth are methamphetamine hydrochloride (HCl) and methamphetamine base.[2] Methamphetamine base form is an oily substance that can be converted into a salt or crystal form known as methamphetamine HCl.

Reynolds's presentence report (PSR) attributed 1.7 kilograms of pure methamphetamine to her. This quantity was based on 44.75 grams of a methamphetamine mixture seized from her home and 1.701 kilograms of a methamphetamine mixture that she admitted to receiving from other codefendants.

---

[1] The Sentencing Guidelines provide for a defendant's offense level to be determined by the higher offense level attributed by either the weight of pure methamphetamine or the weight of the entire mixture of methamphetamine. U.S.S.G. § 2D1.1(c), (Notes to Drug Quantity Table (B)). Here, the relevant quantity is the amount of pure methamphetamine.

[2] "Pure methamphetamine" is methamphetamine (actual) in the Sentencing Guidelines. U.S.S.G. § 2D1.1(c), (Notes to Drug Quantity Table (B)).

No. 16-10676

Reynolds does not dispute that these drugs are attributable to her. Her disagreement is about how these amounts were adjusted to reflect the pure methamphetamine standard that the Guidelines use. The adjustment came from the Texas Department of Public Safety's (DPS) laboratory's estimates. Once a DPS test identifies the presence of methamphetamine in a mixture, it determines the mixture's purity by assuming it to be in methamphetamine base form. If the mixture contains methamphetamine HCl, the purity determination is applied to a conversion formula that accounts for the HCl form being heavier than base form.

When the DPS tests a sample that physically appears to be methamphetamine HCl—a white powder or crystalline substance—it assumes the substance is in fact methamphetamine HCl and applies the HCl conversion formula. The DPS laboratory uses this process because it has determined that it is reasonable to infer that a substance with the physical characteristics of meth HCl is in that form rather than the oily substance known as meth base. The conversion formula has a small margin of error.

The DPS determined the amount of pure meth for which Reynolds was held responsible. It first determined that the purity of the meth was 80.2%, 78.1%, 79.4%, and 79.3%. The DPS did not test the methamphetamine to determine its form, which is one of Reynolds's primary critiques. Instead, it applied the conversion formula that increases the amount of meth to account for HCl form because the seized meth appeared to be in that form. The conversion formula works like this:[3]

---

[3] Kenneth Evans misspoke in his testimony when he articulated the DPS's conversion formula. He states that the formula is the amount of pure methamphetamine base divided by the molecular weight of methamphetamine HCl, multiplied by the molecular weight of the methamphetamine base. The PSR relied on the proper conversion formula rather than the formula Evans articulated.

$$\frac{185.7 \text{ (the molecular weight of methamphetamine HCl)}}{149.2 \text{ (the molecular weight of methamphetamine base)}} \times \text{the amount of pure methamphetamine base}$$

This yielded the following amount of pure methamphetamine HCl for the drugs seized from codefendants and attributed to Reynolds: [4] 99.8%, 97.2%, 98.8%, and 98.6%. This resulted in 1.67 kilograms of pure methamphetamine HCl being attributed to the drugs seized from the codefendants. The PSR then repeated this process for the 44.75 grams seized from Reynolds's home, which yielded 83.1% purity, or 37.14 grams of pure methamphetamine HCl. [5]

These figures put the total methamphetamine attributable to Reynolds above the 1.5 kilogram threshold at which a base offense of 36 applies. U.S.S.G. § 2D1.1(c). Trying to reduce that enhancement by two points, she argued that the conversion formula was an unreliable estimate and that the district court should have attributed less than 1.5 kilograms of meth to her.

At sentencing, the government called Kenneth Evans, the Drug Section Manager of a DPS crime laboratory, who explained the conversion formula and further testified that the formula is reliable despite having a margin of error. In addition, he testified that "it would be reasonable to expect" that methamphetamine sold in Dallas-Fort Worth that has the physical characteristics of methamphetamine HCl is in that form.

The PSR assigned Reynolds a total offense level of 37. Due to a number of prior convictions, Reynolds was assigned the highest criminal-history category of VI. That criminal history also classified Reynolds as a career offender under the Guidelines. But the PSR did not incorporate the offense level for a career offender because Reynolds's offense level under the drug Guideline was higher.

---

[4] The percentages are based on the following calculations: (185.7/149.2) (80.2)= 99.8%; (185.7/149.2) (78.1)= 97.2%; (185.7/149.2) (79.4)= 98.8%; (185.7/149.2) (79.3)= 98.6%.

[5] The percentage is based on the following calculation: (185.7/149.2) (66.8)= 83.1%.

No. 16-10676

All this resulted in an advisory guideline range of 360 months to life imprisonment, which was reduced to a range of 360 to 480 months imprisonment due to the statutory maximum of 40 years. U.S.C. § 841(a)(1) & (b)(1)(B); U.S.S.G. § 5G1.1(a). The court departed downward because of Reynolds's cooperation and sentenced her to 275 months in prison.

Reynolds appealed and asked this court to supplement the record with DEA laboratory reports that were submitted to the district court as part of her codefendants' sentencings. Those reports did test the codefendants' meth to verify that it was in HCl form. The court granted Reynolds's unopposed motion.

## II.

Reynolds argues that the district court clearly erred because it relied on a calculation in the PSR that (1) had a margin of error and (2) presumed that the methamphetamine seized was in HCl form by applying the conversion formula without first testing the sample to determine its form.[6] We review these preserved challenges to the drug quantity amount for clear error. *United States v. Gomez-Alvarez*, 781 F.3d 787, 791 (5th Cir. 2015). There is no clear error if the district court's factual findings are plausible in light of the record as a whole. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). A PSR generally bears sufficient indicia of reliability for the district court to rely on it at sentencing. *United States v. Nava*, 624 F.3d 226, 230–31

---

[6] Reynolds also asserts that the PSR should have calculated the purity of the methamphetamine attributed to her by including the purity of an additional codefendant's seized drugs who used the same supplier she did. Reynolds did not preserve review of which samples of methamphetamine were averaged to determine the purity of the methamphetamine attributed to her. We thus will not review the district court's finding of fact regarding the samples of methamphetamine attributed to Reynolds because "questions of fact capable of resolution by the district court upon proper objection at sentencing can never constitute plain error." *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir. 1991).

(5th Cir. 2010) (citing *United States v. Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007)).  The defendant carries the burden of showing otherwise.  *Nava*, 624 F.3d at 231.

The margin of error Reynolds emphasizes does not render the district court's drug quantity determination erroneous.[7]  She emphasizes that the margin of error can make the DPS's estimates statistically impossible.  Evans conceded that that the margin of error can bring the calculated purity to slightly over 100 percent.  But we have long held that sentencing courts can rely on scientifically acceptable estimates.  *See United States v. Sherrod*, 964 F.2d 1501, 1508 (5th Cir. 1992) (noting that a district court may consider drug quantity estimates for sentencing); *United States v. Alford*, 142 F.3d 825, 832 (5th Cir. 1998) (holding that the district court did not err in relying on estimates when defendant failed to present rebuttal evidence showing that the information in the PSR regarding the drug quantity attributable to him was materially untrue).  Scientific calculations often recognize the possibility of slight deviation.   Reynolds does not explain why the conversion formula is rendered unreliable, materially untrue, or inaccurate by having a small margin of error, especially when the margin of error does not push the drug quantity below the Guideline's threshold amount.   Four of the methamphetamine samples attributed to Reynolds yielded purity rates of between 97.2 and 99.8 percent purity.  It makes sense that applying the small margin of error to methamphetamine samples with such a high purity might

---

[7] At sentencing, the district court noted that "if there was any margin of error in the calculations of the purity of the methamphetamine, I think a sentence of the kind I've described would adequately address that . . . ."  But the government does not argue for harmless error on appeal.  *See United States v. Pineiro*, 410 F.3d 282, 285 (5th Cir. 2005) ("The government bears the burden of showing that the error was harmless beyond a reasonable doubt.").

result in impossible above-100% purity rates.  But merely pointing to the small margin of error is not sufficient rebuttal evidence.

Reynolds next attempts to show error because the DPS crime laboratory assumed that the methamphetamine attributed to her was in HCl form instead of testing it to reach that conclusion.  This matters because methamphetamine HCl is heavier than methamphetamine base.  So applying the HCl conversion formula to a sample that is methamphetamine base would overstate the amount of pure methamphetamine.

We need not decide whether it was proper to assume the samples were in HCl form based on their physical characteristics and experience with similar drugs.  *Cf. United States v. Cadena*, 642 F. App'x. 306, 307 (5th Cir. 2016) (addressing another question about the role of assumptions in sentencing determinations: whether the quantity and purity of seized methamphetamine support a determination that it was imported from Mexico).  The supplemental record provides a definitive answer to the "base or HCl" question.

Reynolds requested that the court supplement the record on appeal. Although we sometimes allow the record to be supplemented on appeal, *United States v. Fernandez-Cuzco*, 447 F.3d 382, 386 (5th Cir. 2006) (citing *Gibson v. Blackburn*, 744 F.2d 403, 405 n.3 (5th Cir. 1984)), we are reluctant to do so. That is in part because a party generally should not be able to defend a judgment based on evidence not submitted to the district court or attack that judgment based on evidence the district court did not have the chance to consider.  But this is a different situation.  The appealing party, Reynolds, supplemented the record with a laboratory report that eliminates any of the guesswork involved in determining the form of the methamphetamine

attributed to her.[8]  The tests performed by the DEA prior to her codefendants' sentencing hearings determined that these samples were methamphetamine HCl.  The samples also each yielded purity rates within the margin of error estimated by the DPS conversion formula.  Thus, the DPS's assumption that the seized methamphetamine was in HCl form was accurate and the conversion formula was not rendered unreliable by having a margin of error.

As Reynolds is the party that asked us to consider this information, we see no reason to ignore a laboratory report that is now part of the record and would make a remand futile.  *Cf. Munoz v. State Farm Lloyds of Texas*, 522 F.3d 568, 573 (5th Cir. 2008) (quoting *United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir. 1993)) ("The invited error doctrine provides that 'a party may not complain on appeal of errors that he himself invited or provoked the court . . . to commit.'").  If we were to find Reynolds's argument about the lack of testing persuasive, on remand the drug quantity question would now have a seemingly irrefutable answer: Reynolds is responsible for more than 1.5 kilograms of pure methamphetamine given the testing performed by the DEA.  We therefore find no reason to vacate the district court's sentence that was based on that same drug quantity determination.

### III.

Reynolds also contends that she does not qualify as a career offender because a case decided after her sentencing—*Mathis v. United States*, 136 S. Ct. 2243 (2016)—purportedly changes the classification of a prior offense. Reynolds concedes this argument was not raised below, so it is subject to plain

---

[8] The supplemented record provides the results from retesting the four samples of methamphetamine seized from codefendants and attributed to Reynolds.  Although the methamphetamine seized from Reynolds's home was not retested, the retested samples yielded enough pure methamphetamine HCl to reach the threshold at which a level 36 base offense applied.  U.S.S.G. § 2D1.1(c).

error. *United States v. Harris*, 740 F.3d 956, 965 (5th Cir. 2014).  But there is no error of any sort as the career offender enhancement did not enhance her Guideline range or otherwise influence her sentence.

The career offender enhancement applies to defendants who are convicted of a crime of violence or controlled substance offense after having sustained two prior convictions that fit in either of those categories.  U.S.S.G. § 4B1.1(a).   The PSR said Reynolds was such a defendant, but that classification had no impact on her Guideline range.  Normally career offender status results in both a higher offense level and criminal history category. U.S.S.G. § 4B1.1(a).  But it changed neither of those things for Reynolds.  Her offense level for dealing methamphetamine was higher than the career offender offense level.  The PSR used the higher offense level pursuant to the Sentencing Guidelines.  U.S.S.G. § 4B1.1(b).  And Reynolds had a criminal-history category of VI—the highest category possible—regardless of her status as a career offender.

Her Guidelines range was, therefore, not the product of any career offender classification.  Reynolds nonetheless speculates that the district court would have considered a more substantial downward departure if the PSR had not mentioned the career offender status.  But there is no authority for her belief that the Guidelines require (or even recommend in the post-*Booker* world of advisory Guidelines) a district court to sentence career offenders at or near the top of the applicable range.   The Guidelines commentary notes that Congress has mandated that the Commission assure that career offenders receive a sentence at or near the statutory maximums.  U.S.S.G. § 4B1.1, cmt. background (discussing 28 U.S.C. § 994(h).   The Commission followed this command in creating the career offender enhancement that automatically designates a defendant as criminal-history category VI and creates what is

usually a higher offense level.  Even when the enhancement has that effect, however, there is nothing requiring or recommending that the court sentence at the high end of that range.  So the career offender enhancements certainly cannot have that effect in a case like Reynolds's when the Guideline range does not flow from that enhancement.

Reynolds similarly misinterprets 18 U.S.C. § 3553(a)(4) as instructing sentencing judges to take particular notice of a career offender finding when it just includes "the applicable category of defendant" as one among many factors a judge considers in sentencing.  18 U.S.C. § 3553(a)(4).  The district court made no mention of Reynolds being a career offender when deciding her sentence.  There is no reason to review a classification that had no bearing on her sentence.

* * *

The judgment is AFFIRMED.